IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEAN COULTER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-1806** |
| | : | |
| **JAMES P. COULTER, SUSAN VERO** | : | |
| **COULTER, KAREN VERO** | : | |
| **MORROW, ROGER MORROW,** | : | |
| **SARA MORROW, BENJAMIN** | : | |
| **MORROW, PAMELA VERO** | : | |
| **HAMMONDS, STEVEN HAMMONDS,** | : | |
| **PATRICK HAMMONDS, MARY** | : | |
| **JOANNE VERO ANDERSON, BRIAN** | : | |
| **ANDERSON, ABIGAIL ANDERSON,** | : | |
| **NICHOLAS ANDERSON, SARA JANE** | : | |
| **SANZOTTI VERO, S. MICHAEL** | : | |
| **YEAGER, STEPHANIE YEAGER** | : | |
| **SHAFFER, WILLIAM R. SHAFFER,** | : | |
| **NANCY NATALE, JOSEPH** | : | |
| **CAPAROSA, LISA M. HYATT,** | : | |
| **BARBARA COULTER, JONATHAN** | : | |
| **W. VALVANO, RONALD ELLIOTT,** | : | |
| **DILLON MCCANDLESS KING** | : | |
| **COULTER AND GRAHAM, OFFICER** | : | |
| **HOWARD, BOB O'NEILL,** | : | |
| **UNKNOWN OFFICER, UNKNOWN** | : | |
| **EMPLOYEES, U.S. DISTRICT JUDGE** | : | |
| **MARILYN HORAN** | | |

## MEMORANDUM

KEARNEY, J.                                                                April 25, 2023

An adult daughter is upset with how her siblings handled assets in their mother's estate and have treated her since resolving the estate disputes. The siblings still seek relief from each other in the Butler County courts in a pending case. The daughter is upset with the Butler County judges' rulings and case assignment. The daughter chose a new forum. She now pro se seeks over 100 million dollars claiming a massive conspiracy by her siblings and seemingly everyone else she thinks are involved in denying her due process in the state courts. She sues her brother's lawyer,

state court judges, members of judges' families, her siblings' families, police officers, court reporters, and fire department employees. She baldly charges a massive conspiracy to deprive her of protected rights. She has not lost her interest in her mother's home. She is still litigating rights in her mother's home in Butler County. She patches together a variety of grievances in and surrounding the state court matters arising from administering her mother's estate. We appreciate she is proceeding without a lawyer and liberally construe her varied theories. But she still needs to plead facts of a conspiracy to deprive her civil rights by persons who can be liable under the civil rights laws. She does not allege facts sufficient to invoke our civil rights laws by simply repeating her conclusion of a massive conspiracy against her. She does not come close after two attempts. We dismiss her amended Complaint with prejudice.

## I.    Alleged *pro se* facts and public record.[1]

Ellen P. Coulter, the mother of three adult children living in Butler County, Pennsylvania, died on December 22, 2004.[2] Ellen Coulter left her estate including the Coulter family home located in Butler County, Pennsylvania and heirlooms to her three children—Jean Coulter, James (Jim) P. Coulter, and Barbara Coulter.[3] Jim Coulter, who is an attorney, petitioned for probate on January 31, 2005 in the Orphans Court Division of the Butler County Court of Common Pleas as the "administrator" of his mother's estate so he could divide his mother's assets among the three Coulter siblings.[4] Attorney Jim filed a first and final account of the estate, disclosed the net estate, and filed the schedule of distribution to each beneficiary, which the Orphans' Court judge approved in 2009.[5] Sister Jean received one third of the estate just like her brother Attorney Jim and sister Barbara.[6] Sister Jean did not object.[7]

The Coulter siblings, at some unidentified time, agreed their sister Jean would pay all the usual, ongoing expenses of the Coulter family home, instead of rent, and Jim and Barbara's rights

to the home would be limited to those of a landlord in a typical landlord/tenant relationship.[8] So Jean paid utilities, taxes, insurance, and for the routine maintenance of the Coulter family home.[9]

Jim offered to sell his share of the Coulter family home to Jean sometime in 2011.[10] Jean gave him a cashier's check after she accepted his written offer to sell his one-third share of the home.[11]

### Jean criticizes her brother Jim's administration of the Estate.

Jean claims Jim stole from Ellen's estate at an unidentified time including from her "Irrevocable Trust Life Insurance Policy and/or Policies."[12] Jim divided one policy between himself and Barbara, leaving Jean out entirely, and sent Jean a forged document to cover it up.[13] Sister Barbara and her husband Jonathan Valvano attempted to cover-up Jim's theft by "permit[ing]" the "obviously forged documents to be sent, via [Mr. Valvano's] 'work' email account, to Jean" so she would be "conned" into believed she already received her share of the insurance proceeds.[14] But Jean alleges Jim also stole from Barbara by excluding her from their mother's second life insurance policy.[15]

Jim also concealed and diverted assets which were "[w]illed" to Jean by allowing his two sons, his wife Susan Vero Coulter, and her extended family to benefit from their mother's estate although they were not named in her will.[16] Jim permitted Susan, Susan's mother Sara Jane Sanzotti Vero, and Susan's three sisters and their families—the Morrow family, the Hammonds family, and the Anderson family—to enter the Coulter family home and allowed them "to remove valuables[.]"[17] For example, Jim's extended family removed "[j]ewelry, silver flatware and other domestic valuables" in 2013 from the Coulter family home despite Jim telling Jean he would move the family heirlooms to a secure area until the Coulter siblings could get together to divide them.[18]

### *Jim enters the Coulter family home in 2013 without Jean's permission.*

Jim also entered the Coulter family home sometime in July 2013 without Jean's permission.[19] Jean became aware of Jim's unauthorized entrance through an alert from her alarm company reporting a possible break-in at the Coulter family home.[20] Jean went to the house and found Jim, his wife Susan, and their son Joseph Coulter wandering through the home.[21] Jim told Jean he broke in through the window because he had to make emergency repairs due to a neighbor's tree damaging the power line.[22] But Jim agreed he and his family "had no business in the home beyond assuring that, on an emergency basis, the condition of the house was not in danger of serious damages occurring in the near future" given the Coulter siblings' earlier agreement Jim and Barbara would have limited access to the home.[23]

### *Various individuals express an interest in the Coulter family home.*

Jean contends various individuals expressed an interest in the Coulter family home to her at unknown times. For example, the Honorable S. Michael Yeager, a Butler County Court of Common Pleas judge, at an unidentified time expressed to Jean how he admired the Coulter family home.[24] Jean "believe[s]" Judge Yeager wanted his daughter, Stephanie Yeager and her husband the Honorable William Shaffer, also a Butler County Court of Common Pleas judge, to buy the home he found so "attractive[.]"[25]

The Honorable Marilyn Horan—then a judge on the Butler County Court of Common Pleas—resides in the same neighborhood as the Coulter family home and had an interest in the Coulter family home.[26] Jean alleges "on a number of occasions" Judge Horan approached Jean to try and convince her to sell the home.[27] Jean contends Judge Horan wanted someone "better suited" than Jean to buy the home "which appears to be legally trained professionals who also 'happen' to be 'at least' Christian, and preferably Catholic."[28]

Jean informed Judge Yeager at some unidentified she would never sell the Coulter family home so it would not be available for purchase until after her death.[29]

### *Jean sues Jim when he refuses to give up his interest the Coulter family home.*

Jean claims she never received Jim's ownership rights to the Coulter family home despite giving him a cashier's check for his interest in the home in 2011.[30] Jim cashed the cashier's check Jean gave him in 2011 at some unidentified time.[31] But then a bank employee told Jean at an unknown time an unidentified person eventually "returned to the bank" the money from the check.[32]

So Jean sued Jim on August 12, 2014 in the Philadelphia County Court of Common Pleas seeking specific performance based on her payment in full for Jim's asking price "of the still jointly owned" Coulter family home.[33] Jean also sought damages for Jim's removal of trees surrounding the Coulter family home; damages for Jim's removal of valuable property from the home from July 2013 through early 2014; damages for defective work on the gutters; damages for invasion of privacy from Jim's extended family entering the Coulter family home so they could divide the Coulter family heirlooms; damages from Jim's family breaking into the Coulter family home in July 2013 and destroying the home alarm system; and damages for expenses incurred by Jean to "travel for repairs" following "break-ins" in 2013 and 2014.[34]

Jim's counsel Ronald Elliott, Esquire of Dillon McCandless King Coulter & Graham LLP moved to transfer Jean's case to the Court of Common Pleas of Butler County.[35] The Honorable Lisette Shirdan-Harris granted the motion to transfer.[36] Jean moved for reconsideration which Judge Shirdan-Harris denied.[37] Jean appealed, but the Pennsylvania Superior Court affirmed holding Judge Shirdan-Harris appropriately granted Jim's motion to transfer her case to Butler County.[38]

***The state court assigns Judge Yeager to hear Jean's case.***

Jean contends "it is clear" Jim and Attorney Elliott transferred the case to Butler County "exclusively for the purposes of assuring" Judge Yeager would be assigned to the case.[39] Jean contends Judge Yeager "admits to having a significant personal interest in the property" and so he took the case so he "would be in the position to rule in the case which would determine [whether Judge] Yeager or one of his relatives would be able to purchase the home."[40] Jean claims Jim, Judge Yeager, Attorney Elliott, and Judge Horan all realized a "friendly" judge needed to hear the case since Jim had already sold his share of the Coulter family home to Jean in 2011.[41]

Jean claims Jim, Judge Yeager, Attorney Elliott, and Judge Horan knew they might not be able to convince the Honorable Thomas Doerr—then President Judge of the Butler County Court of Common Pleas—to assign the case to Judge Yeager, because Judge Doerr "might want to hear the matter himself."[42] So "it seems likely that the co-conspirators knew they could be successful" by delaying the transfer until after the Pennsylvania Supreme Court named Judge Horan as the "Administrative Judge" for the Butler County Court of Common Pleas in 2017 so she should would have the responsibility of assigning the case to Judge Yeager.[43] Judge Horan then assigned her 2014 case to Judge Yeager on August 24, 2017.[44]

***Her brother and others "break into" the vacant Coulter family home.***

Jean claims while she continued to litigate in the state court, Jim, Judge Yeager, Stephanie Yeager, and her husband broke into the Coulter family home with the assistance of the Butler City police and fire departments which she describes as the "assisted break-in[.]"[45] Jean claims the group learned in late December 2021 or early January 2022 Jean had not been staying at the Coulter family home.[46] So Jim called the Butler City police and fire department to report how neighbors had contacted him expressing their concerns about Jean's well-being.[47] Jean claims Jim "chose to

lie" to the police and fire departments when he called them about Jean's well-being so he could use them to assist him in breaking into the home.[48] But Jean admits Jim had keys to the Coulter family home because "Jim is still, officially a co-owner[.]"[49]

Jean also claims Judge Horan and her husband Joseph Caparosa placed two separate, but identical notes on the door of the Coulter family home to let Judge Yeager and his family know the "coast is clear" so they could enter the home on the day of the assisted break-in.[50]

The police never attempted to speak with any of Jean's neighbors about her well-being.[51] And besides receiving two missed calls on her cell phone on January 2, 2022 from an unidentified number, Jean claims there is no sign anyone attempted to contact her or confirm Jim's concern about her well-being.[52] Officer Howard, one of the responding police officers, admitted no member of the police or fire department entered the Coulter family home during the "assisted break-in."[53] Jim instead entered the home without emergency personnel.[54] But no one ever "re-secured" the Coulter family home.[55] So Jean found the front door unlocked when she eventually returned.[56]

Jean claims Jim, during the assisted break-in, provided Judge Yeager, his family members, and their contractors "unfettered and secret access" to the Coulter family home.[57] And since neither the police nor fire departments ever confirmed Jean's "status" or well-being, Jean claims it is "patently obvious" Jim had no interest at looking into Jean's well-being and the sole purpose of the "break-in" had been to give Judge Yeager and his family access to the property.[58]

### Jim sues Jean in state court to partition the Coulter family home.

Jim, again represented by Attorney Elliott, sued Jean in the Butler County Court of Common Pleas on February 2, 2022, about a month after the "assisted break-in."[59] Jim asked the court to partition the Coulter family home and approve a sale.[60] Jim is also seeking rent and other expenses from Jean for the Coulter family home.[61]

Jean claims Judge Yeager assigned himself to the partition action.[62] The state court then consolidated Jim's partition action and Jean's 2014 case.[63] Jean claims court reporters "adjusted" the transcripts during multiple motion hearings to benefit Judge Yeager and Jim.[64] For example, Jean claims the court reporters eliminated an exchange where Judge Yeager demanded Jean name a specific price to sell her share of the Coulter family home to Jim and "after many attempts to convince [Judge] Yeager" she did not intend to sell the home, she finally named a price of $1,000,000.00.[65]

Jean contends even after presenting proof of Jim's written offer from 2011 to sell his share of the Coulter family home, her acceptance, and her cashier's check proving her payment in full to Jim, Judge Yeager still refused to order specific performance during a November 2022 hearing.[66] And Attorney Elliott continues to deny the existence of the cashier's check.[67] But Jim had the cashier's check in his possession during the November 2022 hearing where "he waved [it] in front of" Judge Yeager, but neither Jim nor Judge Yeager opened the envelope or placed it into evidence.[68]

Jean claims Judge Yeager is "committed" to assuring Jim becomes the sole-owner of the Coulter family home so Jim will sell the home to Stephanie Yeager and her husband.[69] So he has developed "interesting legal principals" such as finding Barbara Coulter gave up her rights to the home by relying on a "forged" deed which shows Barbara sold her interest to Jim.[70] And Judge Yeager and Jim conspired to delay the division of the family home "until such a time as [Judge] Yeager's daughter [Stephanie] . . . could move into the home" Judge Yeager finds so attractive.[71]

Jean also contends Judge Yeager has known about Jim's thefts and his misappropriation of their mother's estate but chose to "conceal this information from the state's Disciplinary Board in

violation of the Code of Conduct[.]"[72] So Judge Yeager must be "in cahoots" with Jim since he has accepted Jim's state court filings without reporting him to the Disciplinary Board.[73]

Judge Yeager recused himself on January 10, 2023 from the consolidated state court action.[74] The partition action is still pending in the Butler County Court of Common Pleas.[75] And, as best as we can discern, Jean does not allege anyone has offered to buy the Coulter family home from her, or the home has been sold or taken away from her. Jean continues with the status quo and is upset or frustrated with the pace of the state court cases she began.

## II.   Analysis

So Jean came to federal court. She is familiar with this federal court including from when Judge Bissoon found her to be vexatious litigant in matters involving her child and prohibited her from bringing civil rights cases related to or arising from certain state court proceedings.[76] She now asks us to award her 100 million dollars plus the value of family heirlooms she claims taken over ten years ago. She sues her family members, judges, neighbors, lawyers, a law firm, court reporters, police officers, and employees of the fire department in what appears to be, in part, an attempt to litigate state law estate claims not decided in her favor. Jean alleges a civil rights conspiracy under 42 U.S.C. § 1983 between these individuals who she claims conspired to take the Coulter family home from her (without success to date) and heirlooms without due process.[77] Jean bases the alleged conspiracy on a series of discrete acts spanning more than a decade including: Jim diverting assets from the mother's estate to his extended family; Jim's extended family taking Coulter family heirlooms; Judge Yeager's desire for his daughter to buy the Coulter family home; Judge Horan and her husband's interest in getting a "legally trained" neighbor; Judge Yeager's rulings in state court cases not decided in Jean's favor; court reporters adjusting state

court transcripts; and Jim using the police and fire departments to "break-into" the Coulter family home.

Jean seems to plead all the named individuals and entities participated in one overarching conspiracy. But she then breaks her amended Complaint down into five "claims":

- **Claim I** (identified as a "Federal Claim"): a conspiracy based on the transfer and assignment of Jean's state court case to Judge Yeager involving Jim, Attorney Elliott, and Judges Horan and Yeager.[78]

- **Claim II** (identified as a "Federal Claim"): a conspiracy based on the City of Butler police and fire departments breaking into the Coulter family home involving Jim, Judge Yeager, Stephanie Yeager, Judge Shaffer, Judge Horan, Joseph Caparosa, Attorney Elliott, Officer Howard, and officers from the City of Butler police and fire departments.[79]

- **Claim III** (identified as a "Federal Claim"): a conspiracy based on fraud in the state court case to take Jean's interest in the Coulter family home involving Jim, Judge Yeager, Attorney Elliott, and the court reporters.[80]

- **Claim IV** (identified as a "Related State Court Claim and Federal Claim"): a conspiracy based on Jim's extended family taking Coulter family heirlooms also alleging fraud, theft, theft by deception, conversion, replevin, invasion of privacy, and trespass involving Jim, Judge Yeager, officers from the City of Butler police and fire departments, and Jim's extended family.[81]

- **Claim V** (identified as a "Related State Court Claim"): claims for theft, theft by deception, fraud, and "perhaps even" unfair and deceptive business practices related to Jim taking proceeds from Ellen's life insurance policy involving Jim, his wife Susan Coulter, Barbara, and her husband Jonathan Valvano.[82]

Jean seeks 100 million dollars in compensatory and punitive damages and the value of "any/all of the family heirlooms (including those which can be recovered)" which were distributed to members of Jim's extended family or sold instead of being "held in trust[.]"[83] Jean also asks we report Jim's action as unethical and "in some cases criminal" to both the state disciplinary board and federal law enforcement.[84]

Jean's siblings and their families, Judge Yeager and his family, Judge Horan and her husband, Attorney Elliott and his law firm, the court reporters, Officers Howard, Chief of Police

O'Neill, the unknown officer of the police of the City of Butler, and the unknown employees of

the City of Butler fire department move to dismiss due to lack of subject-matter jurisdiction, failure

to state a claim, and lack of diversity jurisdiction.[85] They jointly argue: (1) Jean fails to state a civil

rights claim under 42 U.S.C. § 1983 against the private individual who are not state actors; (2) the

*Rooker-Feldman* doctrine bars claims to the extent Jean is challenging state court rulings; (3) the

*Princess Lida* abstention doctrine bars Jean's request for us to exercise some control over the

property in dispute which is being litigated in state court; (4) Jean fails to state a claim for

conspiracy under 42 U.S.C. § 1985;  (5) Jean's "kitchen sink" style of pleading violates Federal

Rule of Civil Procedure 8; and (6) diversity jurisdiction is lacking over Jean's state law claims.[86]

Judges Yeager, Shaffer, and Horan also move to dismiss arguing: (1) they are immune from

suit based on judicial and Eleventh Amendment immunity; (2) they are not "persons" subject to

suit under 42 U.S.C. § 1983; (3) they are entitled to sovereign immunity from any state law claims;

(4) we lack jurisdiction to review the actions based on the doctrines of abstention; (5) Jean fails to

state a due process or conspiracy claim; and (6) certain conduct is barred by the two-year statute

of limitations period.[87] Officer Howard, Chief of Police Bob O'Neill, the unknown police officer

of the City of Butler, and the unknown employees of the City of Butler fire department also move

to dismiss and argue the claims against them are barred by the doctrine of qualified immunity.[88]

Judge Horan and her husband Joseph Caparosa separately argue the facts alleged against them are

insufficient to state a section 1983 civil conspiracy claim.[89] And Nancy Natale and Lisa Hyatt,

both court reporters, move to dismiss because the claims against them are barred by quasi-judicial

immunity.[90]

Jean responds with a conclusion "all of the Defendants' claims of Immunity [*sic*] are

frivolous."[91] And then Jean proceeds to add facts not included in her amended Complaint in what

appears to be an attempt to bolster her allegations.[92] But we may only consider those facts alleged in Jean's amended Complaint and subject to Rule 11 good faith obligations.[93] We must determine whether Jean states a claim based on the facts pleaded, not on new facts brought to light in Jean's opposition.[94]

We enjoy jurisdiction to address Jean's theories except for challenges to issues fully resolved in the litigation involving her mother's estate. She also sue on other theories. But she sues persons who are immune or who are not state actors necessary for a civil rights claim. She fails to plead facts of a conspiracy beyond her theories. We decline supplemental jurisdiction. We tried to amend to address these deficiencies. She cannot do so. We must dismiss these theories with prejudice.

### A.  We have jurisdiction to review Jean's section 1983 conspiracy claim.

Jean claims her family members, judges, neighbors, police officers, fire department employees, lawyers, a law firm, and court reporters conspired against her to deprive her of property without due process. But Jean seems, in part, to be attempting to re-litigate state law estate claims not decided in her favor. For example, Jean appears to be challenging the Orphans' Court's 2009 order distributing her mother's estate which included the division of the Coulter family property and heirlooms.[95] Jean also appears to be upset with the progression of the ongoing state court proceeding.[96]

Jean's siblings and their families, Judge Yeager and his family, Judge Horan and her husband, Attorney Elliott and his law firm, the court reporters, the police officers, and the fire department employees argue the *Rooker-Feldman* doctrine and various doctrines of abstention—including *Younger* abstention, the *Princess Lida* doctrine, and the *Colorado River* doctrine—bar this action to the extend Jean is attempting to challenge state court rulings.

They are correct the *Rooker-Feldman* doctrine bars our review of the Orphans' Court's 2009 order. But we are not precluded from hearing Jean's 42 U.S.C. § 1983 conspiracy claim for monetary damages based on *Younger* abstention, the *Princess Lida* doctrine, or the *Colorado River* doctrine.

### 1. The *Rooker-Feldman* bars Jean's attempt to re-litigate the administration of her mother's estate.

The Supreme Court instructs "federal district courts lack jurisdiction over suits that are essentially appeals from state-court judgments[,]" which is known as the *Rooker-Feldman* doctrine.[97] "*Rooker-Feldman* is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers inviting district court review and rejection of the state court's judgments[.]"[98] So "it does not apply to harms somehow related to, but not caused by, state court judgments."[99] While this doctrine is "narrow" it encompasses some of Jean's claim.[100]

Our Court of Appeals has identified four requirements for the *Rooker-Feldman* doctrine to apply: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments."[101] The second requirement—Jean must be complaining of injuries caused by a state-court judgment—can be difficult to correctly apply.[102] "The critical task is thus to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury 'produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it.'"[103]

But where "a federal plaintiff asserts injury caused by the defendant's actions and not by the state-court judgment, *Rooker-Feldman* is not a bar to federal jurisdiction."[104] Assessing whether the *Rooker-Feldman* doctrine applies can be particularly difficult in cases like Jean's, where "a federal plaintiff complains of an injury that is in some fashion related to a state-court

proceeding," such as a claim for fraud upon the court or a claimed conspiracy with the defendant judges, "neither of which necessarily compels the conclusion that the state court erred in its decisions"—since "even injuries that 'help[ ] to cause the adverse state judgments' may be 'independent' of those judgments."[105]

Judge Blewitt's analysis in *Mason v. Stroyan* offers guidance. Judge Blewitt considered "constitutional claims" raised by Ms. Mason which sought to vacate the Pike County Orphans' Court decision as to the validity of a will, and vacate an order denying Ms. Mason's husband's motion to be administrator of the estate at issue.[106] Judge Blewitt found to the extent "[Ms. Mason's] claims challenge the orders of the Pike County Orphans' Court regarding the handling of [the] estate, and failing to recognize the [will] and her interest in [the] property, we find that any relief [Ms. Mason] is seeking is clearly barred by the *Rooker-Feldman* Doctrine."[107] Judge Blewitt reasoned Ms. Mason's claim "necessarily would require a determination that the orders of Pike County Orphans' Court and the sale of [the] property were void."[108]

Jean seeks 100 million dollars, and the value of "any/all" the family heirlooms based on the alleged conspiracy to take the Coulter family home and heirlooms. To the extent Jean is asking us to reject the Orphans' Court's Order regarding the administration of her mother's estate or is challenging her brother Jim's appointment as the administrator of the estate—although it is unclear whether Jean is even asking for this relief—or is asking us to return heirlooms not distributed to her, we cannot do so. Like Ms. Mason in *Mason v. Stroyan*, we are precluded by the *Rooker-Feldman* doctrine from essentially vacating the Butler County Orphans' Court's orders or returning heirlooms not distributed to her since this would have the effect of undoing the state court's administration of Ellen Coulter's estate.[109] The Orphans' Court Division of the Butler County Court of Common Pleas approved the distribution of Ellen Coulter's estate in 2009 long

before Jean filed his case. Each sibling received one-third of their mother's estate. Jean never objected. We cannot review and reject the Orphans' Court Order. Nor did she appeal.

But Jean's 42 U.S.C. § 1983 conspiracy claim for monetary damages—although partially based on her ongoing civil case in Butler County but also based on acts by private actors not involved in the civil case—is not barred by the *Rooker-Feldman* doctrine. Jean's claim for monetary damages is independent of the merits of the ongoing civil case. And as our Court of Appeals held in *Great Western Mining & Mineral Company v. Fox Rothschild LLP,* "[r]egardless of the merits of the state-court decisions, if [Jean] could prove the existence of a conspiracy to reach a predetermined outcome in state court, [she] could recover nominal damages for this due process violation" because her "entitlement to such damages could be assessed without any analysis of the state-court judgments."[110]

### 2. We decline to abstain under *Younger*.

*Younger* abstention is not a jurisdictional principle, but a doctrine first announced by the Supreme Court in *Younger v. Harris* in the context of preventing federal courts from interfering with ongoing state criminal proceedings.[111] Under *Younger*, we abstain from, and dismiss, claims otherwise within the scope of federal jurisdiction when "exceptional circumstances . . . justify a federal court's refusal to decide a case in deference to the States."[112]

"*Younger* abstention applies where a federal plaintiff seeks to enjoin state proceedings."[113] We apply a two-stage analysis to determine whether *Younger* abstention applies. First, we examine whether the underlying state court litigation falls within one of three "exceptional circumstances": (1) "state criminal prosecutions"; (2) "civil enforcement proceedings"; and (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions."[114] We then move to the second stage of our analysis. In the second stage, we consider

15

three factors articulated by the Supreme Court in *Middlesex County Ethics Committee v. Garden State Bar Association*: whether "(1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings implicate important state interests; and (3) the state proceedings afford an adequate opportunity to raise federal claims."[115] We must abstain under *Younger* if these factors apply. But "[e]ven when the three-prong test is met, *Younger* abstention is not appropriate when "(1) the state proceedings are being undertaken in bad faith or for purposes of harassment or (2) some other extraordinary circumstances exist[.]"[116]

We are guided by Judge Pratter's reasoning in *Mikhail v. Kahn* where a husband sued his wife, attorneys, and judges under section 1983 alleging they, among other things, conspired to deprive him of his constitutional rights through state child protection from abuse proceedings, custody proceedings, and divorce proceedings.[117] Judge Pratter found the husband's section 1983 conspiracy claim for monetary damages alleging "conspiracy among or between the defendant judges and court-appointed officials and [the wife] and her attorneys . . . not barred by *Rooker-Feldman* (given that the due process injury would not result from the judgments), or by *Younger* (because such a conspiracy would almost certainly fall into *Younger's* narrow carve-out for 'exceptional circumstances')."[118] Judge Pratter recognized "*Younger* does not apply to the money damages claims in this case, because regardless of whether it can ever be applied to damages claims, *Younger* abstention is only appropriate where the precise claims raised in federal court are available in the ongoing state proceedings[.]"[119]

Jean does not appear to be seeking injunctive relief, declaratory relief, and is not asking us to enjoin the state court proceedings. Jean instead seeks 100 hundred million dollars and the value of "any/all" the family heirlooms arising from an alleged conspiracy to deprive her of due process to take the Coulter family home (which she apparently still retains) and heirlooms. The alleged

conspiracy is based on a variety of facts spanning over a decade, including conduct which occurred in an ongoing state civil case; an alleged break-in from 2022; alleged thefts from 2013; various individuals expressed interested in the home; and her brother's administration of their mother's estate in 2009. Jean also asks we report her brother's conduct to the state and/or federal disciplinary authorities.

Although there is an ongoing state court action which is still being litigated, and the state court action may involve an important state interest—the partition of the Coulter family property—*Younger* does not apply to Jean's damages claims today.[120] Jean likely could not raise her current claims for damages in her state court proceeding given twenty-nine of the individuals and/or entities she sues here are not involved in the ongoing state court proceeding, and her alleged conspiracy includes facts and events wholly unrelated to the ongoing state civil proceeding. And as Judge Pratter recognized in *Mikhail*, "*Younger* does not apply to the money damages claims" and "is only appropriate where the precise claims raised in federal court are available in the ongoing state proceedings[.]"[121]

Jean's conspiracy claim under section 1983 seeking only monetary damages does not interfere with the ongoing state court proceedings.[122] We need not abstain from hearing her claims for monetary damages under section 1983.

### 3.   We decline to abstain under the *Princess Lida* abstention doctrine.

Our Supreme Court has long recognized "the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts."[123] In *Princess Lida of Thurn & Taxis v. Thompson*, the Supreme Court held we are prevented from exercising jurisdiction "when a court in a previously filed action is exercising control over the property at issue and the second court must exercise control over the same property in order to grant the relief sought," even where

the property has not actually been seized.[124] We abstain under *Princess Lida* when: "(1) the litigation in both the first and second fora are *in rem* or *quasi in rem* in nature, and (2) the relief sought requires that the second court exercise control over the property in dispute and such property is already under the control of the first court."[125]

Our Court of Appeals in *Dyno v. Dyno* held the district court lacked jurisdiction to hear a party's suit brought under section 1983 where the party asked the district court "to order the distribution of specific property subject to the jurisdiction of the Orphans' Court."[126] Our Court of Appeals reasoned the district court lacked jurisdiction under the *Princess Lida* doctrine because "[t]o grant the relief sought by the plaintiffs, the District Court would have had to exercise control over the shares of stock at issue."[127]

We are not facing the same facts. The Butler County Orphans' Court exercised control over the mother's estate including the Coulter family home in 2009. And now, the Court of Common Pleas of Butler County is exercising control of the Coulter family home in the partition action. But we do not need to exercise control over the Coulter family home to decide Jean's conspiracy claim under section 1983 unlike in *Dyno v. Dyno*. Jean seeks only monetary damages. And to the extent Jean is seeking the return of family heirlooms not distributed to her or is asking us to review the Orphans' Court's 2009 order, the *Rooker-Feldman* doctrine bars such review.

We need not abstain from hearing Jean's section 1983 conspiracy claim for monetary damages under the *Princess Lida* doctrine.

### 4.   We decline to abstain under *Colorado River*.

"The *Colorado River* doctrine allows a federal court to abstain, either by staying or dismissing a pending federal action, when there is a parallel ongoing state court proceeding."[128]

We narrowly apply this doctrine because we "have a strict duty to exercise the jurisdiction . . . conferred upon [us] by Congress."[129]

We conduct a two-part inquiry to determine whether we should abstain under the *Colorado River* doctrine.  First, we consider whether there is a parallel state proceeding raising "substantially identical claims [and] nearly identical allegations and issues."[130] We consider cases parallel when "they involve the same parties and claims."[131] But "[t]he presence of additional parties in the state action does not destroy the parallel nature of the cases when all of the parties in the federal action are also parties in the state action."[132] If we find the state proceeding and federal proceeding parallel, we then apply a multi-factor test to determine whether "extraordinary circumstances" merit abstention.[133]

There is no parallel state court proceeding to our knowledge. There is instead an ongoing state court case involving Jean and Jim concerning the partition of the Coulter family home. Jean now sues her siblings and their families, Judge Yeager and his family, Judge Horan and her husband, Attorney Elliott and his law firm, the court reporters, Officer Howard, Chief of Police O'Neill, the unknown officer of the police of the City of Butler, and the unknown employees of the City of Butler fire department for conspiring to take the Coulter family home.[134] These two actions are not "substantially identical."

Given the narrow application of *Colorado River* abstention, together with our "virtually unflagging obligation" to exercise our jurisdiction to adjudicate a controversy properly before us, we decline to abstain under the *Colorado River* doctrine.  We retain jurisdiction over Jean's section 1983 conspiracy claim.

**B.  Jean fails to plead a civil conspiracy claim under section 1983.**

Jean alleges family members, judges, neighbors, lawyers, a law firm, court reporters, police officers, and fire department employees conspired to deprive her of her share of the Coulter family home and family heirlooms by violating her due process rights.[135] The private individuals and entity Jean sues—including extended family members, neighbors, lawyers, and a law firm—argue Jean fails to state a civil rights conspiracy claim under 42 U.S.C. § 1983 against them as they are not state actors.[136] The state actors Jean sues—including the judges, court reporters, fire department employees, and police officers—argue they are immune from suit under 42 U.S.C. § 1983 and, even if not, Jeans fails to allege facts sufficient to set forth a civil rights due process violation or conspiracy claim.[137] We agree. Jean cannot plead this civil conspiracy claim as a matter of law.

Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law[.]"[138] The Fourteenth Amendment's Due Process Clause protects both substantive and procedural due process rights.[139] The relevant inquiry in determining whether government conduct violates substantive due process "is whether the behavior of the government officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."[140] Jean must establish "the loss of a protected property interest without adequate process" to succeed on a Fourteenth Amendment procedural due process claim.[141]

To prevail on a conspiracy claim under section 1983, Jean must prove persons acting under color of state law "reached an understanding" to deprive her of her constitutional rights—here, Jean's procedural due process rights.[142] Section 1983 protects against constitutional violations by the state, but "not against wrongs done by individuals[.]"[143] So we only apply section 1983 when

the state is responsible for the specific conduct causing the alleged harm.[144] Private individuals

ordinarily "do not act under color of state law" and thus "are not liable under Section 1983."[145]

But "[p]rivate individuals may be deemed to have acted under color of state law in a § 1983 action

if they conspired with state actors to violate a plaintiffs civil rights" but such claims must rise

above "mere labels and conclusions."[146]

"With respect to the conspiracy aspect of a Section 1983 conspiracy claim, in order to

survive a Rule 12(b)(6) motion to dismiss, [Jean's] 'allegations of a conspiracy must provide some

factual basis to support the existence of the elements of a conspiracy: agreement and concerted

action.'"[147] The elements of a claim of conspiracy to violate federal civil rights are: "(1) two or

more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the

conspirators performs . . .  any overt act in furtherance of the conspiracy; and (3) that overt act

injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a

citizen of the United States," with the added gloss under section 1983 "the conspirators act 'under

the color of state law.'"[148] And we are mindful "[a] conspiracy claim cannot be based merely on

suspicion or speculation."[149]

### 1. We dismiss Jean's section 1983 conspiracy and due process claims against Judge Yeager with prejudice.

Jean claims Judge Yeager violated her Fourteenth Amendment due process rights for

decisions he made as a state court judge. She claims he conspired to violate her due process and

property rights with his daughter and her husband, Jean's brother, extended family, court reporters,

police officers, fire department employees, and other judges and lawyers. Judge Yeager argues the

claims against him are barred based on the doctrine of absolute judicial immunity.[150] Jean responds

he is "without immunity" because "his actions inside the courthouse are not being considered."[151]

"A judicial officer in the performance of his duties has absolute immunity from suit and will not be liable for his judicial acts."[152] We apply the same absolute immunity standard to civil rights conspiracy claims as to ordinary civil rights claims.[153] A judge's immunity is overcome only if: (1) the judge did not act in his judicial capacity; or (2) the judge acted "in the complete absence of all jurisdiction."[154] A judge acts in his judicial capacity when he performs "a function normally performed by a judge."[155] Where generally "a court has some subject matter jurisdiction, there is sufficient jurisdiction for immunity purposes."[156] A judge will not be deprived of immunity because he acted in error, maliciously, or in excess of his authority; "rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction."[157] Our Court of Appeals directs judges are protected by absolute judicial immunity when they make judicial determination in state court proceedings.[158] "Actions for which a person has absolute immunity are not considered in establishing a § 1983 conspiracy claim."[159]

Jean's claims against Judge Yeager challenge the rulings Judge Yeager undertook as a state court judge in the pending consolidated case despite her claim "his actions inside the courthouse are not being considered."[160] For example, Jean alleges Judge Yeager and her brother Jim conspired to delay the division of the family home "until such a time as [Judge] Yeager's daughter [Stephanie] . . . could move into the home[.]"[161] Jean contends Judge Yeager refused to order specific performance after she presented proof of Jim's 2011 written offer to sell his share of the Coulter family home during a November 2022 hearing.[162] Jean alleges Judge Yeager is "committed" to assuring Jim becomes the sole-owner of the Coulter family home so Jim can then sell the family home to Judge Yeager's daughter and will go so far as to develop "interesting legal principals" such as finding Barbara Coulter gave up her rights to the home by relying on a "forged" deed which shows Barbara sold her interest to Jim.[163] Jean also claims in late December 2021 or

early January 2022 Judge Yeager toured the Coulter family home with Jim and his daughter.[164] But there are no allegations anyone has offered to buy the Coulter family home from Jean, including Judge Yeager or his daughter, or the home has been sold or taken away from Jean.

Jean does not and cannot allege facts showing Judge Yeager acted in the clear absence of jurisdiction when he refused to order specific performance or found Barbara Coulter gave up her interest in the Coulter family home to Jim. Jean's real complaint is Judge Yeager did not rule in her favor on certain motions and he has on at least one occasion expressed an interest in the Coulter family home. We have no basis in public record or pleadings to find Jean appealed these decisions.[165] She instead asks us to serve as an appellate court. We cannot do so. Jean's section 1983 conspiracy claim against Judge Yeager for his judicial actions in his individual capacity is barred under the doctrine of absolute judicial immunity.

To the extent Jean is bringing a section 1983 claim for monetary damages against Judge Yeager in his official capacity, she is barred by the immunity afforded to the states by the Eleventh Amendment.[166] And any claims against Judge Yeager acting outside his judicial capacity—such as by touring the Coulter family home—fail to state a conspiracy claim under section 1983 because Jean fails to allege her brother Jim or anyone else violated a constitutional right when a group, guided by Jim who Jean admits remained a co-owner of the home, toured the home.

We dismiss with prejudice Jean's claims against Judge Yeager in his official and individual capacity as Jean has now had two attempts to plead these facts.

> **2. We dismiss Jean's section 1983 conspiracy and due process claims against Judge Horan with prejudice.**

Jean alleges Judge Horan who resides in the same neighborhood as the Coulter family home also conspired to take the Coulter family home.[167] Jean contends Judge Horan wanted someone "better suited" than Jean to buy the home such as a "legally trained professional[] who

also 'happened' to be 'at least' Christian, and preferably Catholic."[168] Jean alleges Judge Horan placed a note on the door of the Coulter family home as some sort of signal to let Judge Yeager and his family know the "coast is clear" so they could enter the home on the day of the assisted break-in.[169] And Jean points to actions Judge Horan took as the "Administrative Judge" for the Butler County Court of Common Pleas in 2017 as evidence of her involvement in the conspiracy when she assigned Jean's case to Judge Yeager so a "friendly" judge would hear her case.[170]

Judge Horan argues the claims against her are barred by the doctrine of absolute judicial immunity.[171] And any actions taken by Judge Horan outside of her judicial capacity fail to state a claim under section 1983.[172] Jean responds Judge Horan is only part of the conspiracy as "her role of neighbor" but then also contends she is involved for "her role as the newly appointed 'Administrative Judge' of Butler County."[173]

Judge Horan has absolute immunity from suit and will not be liable for her judicial acts to the extent Jean is suing Judge Horan for judicial decisions even as the administrative judge of Butler County.[174] Jean does not and cannot allege facts showing Judge Horan acted in the clear absence of jurisdiction when she assigned Judge Yeager to Jean's civil case. Jean's section 1983 conspiracy claim against Judge Horan for her judicial actions in her individual capacity is barred under the doctrine of absolute judicial immunity.

To the extent Jean is bringing a section 1983 claim for monetary damages against Judge Horan in her official capacity, she is barred by the immunity afforded to the states by the Eleventh Amendment.[175] And any facts alleged against Judge Horan acting outside her judicial capacity— such as by being a "neighbor" and placing a note on the Coulter family home door—fail to state a conspiracy claim under section 1983 because Jean does not allege Judge Horan violated a constitutional right by placing a note on the door of the Coulter family home. And Judge Horan

placing a note on her neighbor's door is not enough to establish state action because Jean's conclusory allegations "with no supporting factual averments are insufficient" as she does not "present facts tending to show agreement and concerted action."[176]

We dismiss with prejudice Jean's claims against Judge Horan in both her official and individual capacity as Jean has now had two attempts to plead these facts.

### 3. We dismiss Jean's 1983 conspiracy claims against Court Reporters Natale and Hyatt with prejudice.

Jean sues Court Reporters Natale and Hyatt because Judge Yeager requested they "adjust" transcripts in the partition action.[177] But Jean is uncertain which court reporter "recorded" the discussions at issue as she "only remembers seeing the one face in the courtroom."[178] Court Reporters Natale and Hyatt respond arguing the claims against them are barred by quasi-judicial immunity and, even if not, Jean fails to state a claim for conspiracy under section 1983.[179]

We first acknowledge Jean does not have a constitutional right to an error free transcript.[180] "[A] constitutional violation would occur only if the inaccuracies in the transcript adversely affected appellate review in the state courts" so we ask "whether [Jean] has alleged deficiencies in the trial transcript substantial enough to call into question the validity of the appellate process in the state courts."[181] "While court reporters are not entitled to absolute judicial immunity simply by virtue of their position . . . quasi-judicial immunity applies to court staff, such as clerks of judicial records and court reporters, who are acting in their official capacities."[182]

Jean contends Court Reporters Natale and Hyatt acted in their official capacity as court reporters during their alleged involvement in the conspiracy. Although Jean disputes the completeness and accuracy of the transcripts, she alleges no facts Court Reporters Natale and Hyatt acted in a role other than their official capacities as court reporters.

We dismiss Jean's section 1983 claims against Court Reporters Natale and Hyatt with prejudice because they have absolute quasi-judicial immunity for their acts taken in their court-appointed roles.

### 4. We dismiss Jean's section 1983 conspiracy claims against police officers and fire department employees with prejudice.

Jean alleges Officers Howard, Chief of Police O'Neill, an unknown officer of the City of Butler police department, and unknown employees of the City of Butler fire department violated her due process and property rights by conspiring during the "assisted break-in" of the Coulter family home. Jim called the Butler City police department in late December or early January 2022 to report neighbors expressing concerns about Jean's well-being.[183] Jean claims her brother Jim "chose to lie" to the police and fire departments when he called them about Jean's well-being so he could use them to assist him in breaking into the home.[184] But she admits Jim remained a co-owner of the Coulter family home when he made the calls.[185] And Jean admits Officer Howard, one of the responding police officers, admitted no member of the police or fire departments entered the Coulter family home during the "assisted break-in."[186] Jim instead entered the home without emergency personnel.[187]

Officer Howard, Chief of Police O'Neill, the unknown officer of the police department, and the unknown employees of the fire department argue the claims brought against them are barred by the doctrine of qualified immunity.[188] Jean responds their claims of immunity are "frivolous" because they failed to perform what she considers to be an adequate wellness check.[189]

State officials performing discretionary acts may enjoy qualified immunity from money damages in section 1983 causes of action.[190] They "are entitled to qualified immunity for their actions if their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."[191] "Qualified immunity shall be upheld on a 12(b)(6) motion only when the defense is established on the face of the complaint."[192]

We apply a two-step test to determine whether qualified immunity shields a government official's action from section 1983 liability: "(1) whether the facts alleged by [Jean] establish a violation of a constitutional right and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation such that a reasonable official would understand that what he is doing violates that right."[193] To prevail on her conspiracy claim under section 1983, Jean "must prove that persons acting under color of state law 'reached an understanding' to deprive [Jean] of [her] constitutional rights."[194] And "[c]learly established" means "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."[195]

These two questions may be answered in either order.[196] Although we should analyze the specific conduct of each individual separately, because Jean alleged the police officers and fire department employees acted in concert we may consider their actions together.[197] This analysis is informed by "only the facts that were knowable to the defendant officers."[198] If Jean fails to establish the underlying offense through her allegations, "there is no necessity for further inquiries concerning qualified immunity."[199]

Jean has not and cannot allege the police officers or fire department employees violated a constitutional right by taking her brother Jim's call. The police officers and fire department employees, as alleged by Jean, responded to a welfare call by Jim, a co-owner of the Coulter family home, but did not even enter the home. Wellness checks are not constitutional violations where Jean failed to allege the wellness check infringed on her constitutional rights.[200] And Jean alleges no facts of an agreement or understanding among the police officers, fire department employees,

Judge Yeager, her brother Jim, or anybody else to deprive her of property without due process of law. There is no wrong to address against the police officers and fire department employees because Jean has not and cannot allege facts showing they violated her constitutional rights in connection with her brother Jim's entry into the family home which Jean admits he still partially owns.

We dismiss Jean's conspiracy claims against Officers Howard, Chief of Police O'Neill, an unknown police officer, and an unknown employee of the fire department in their individual capacities with prejudice. Although the principles of qualified immunity may be applicable to this case, we need not assess the second step of the qualified immunity analysis as to whether the underlying rights were clearly established because Jean failed to allege a constitutional violation. To the extent Jean sues the police officers and fire department employees in their official capacities for money damages, such claims are barred by the Eleventh Amendment.[201]

We dismiss all claims against Officers Howard, Chief of Police O'Neill, an unknown officer of the City of Butler police department, and unknown employees of the City of Butler fire department with prejudice as Jean already had an opportunity to cure these defects.

### 5. Jean fails to state a civil rights conspiracy claim against private individuals.

We are now left with Jean's section 1983 conspiracy claim against only private individuals including: Jean's brother Jim, his family, and extended family; Jean's sister Barbara and her husband; Judge Yeager's daughter and her husband; Judge Horan's husband; and Attorney Elliott and his law firm. As our Court of Appeals reminded Jean over ten years ago in 2012, Jean must show these private individuals acted "under color of state law" to sustain a claim under section 1983.[202] Jean ignored our Court of Appeals' direction.

Constitutional claims are generally only available when the government is responsible for the specific conduct giving rise to a claim but "[a] private actor may qualify as a governmental actor in limited circumstances, including when the private entity performs a traditional public function, when the government compels the private entity to take a particular action, or when the government acts jointly with the private entity."[203] "Private individuals may be deemed to have acted under color of state law in a § 1983 action if they conspired with state actors to violate a plaintiffs civil rights" but "such claims must rise above 'mere labels and conclusions.'"[204] As Judge Huyett recognized about thirty years ago in *Hammond v. Creative Financial Planning Organization Inc*., a party fails to allege a conspiracy claim under 1983 where the facts alleged are "sketchy, episodic, and uneven" and "jump from one isolated event to another" while "expect[ing] the reader to fill in the gaps."[205]

Where Jean "attempts to assert the necessary 'state action' by implicating state officials or judges in a conspiracy with private defendants, mere conclusory allegations with no supporting factual averments are insufficient; the pleadings must specifically present facts tending to show agreement and concerted action."[206] And the requisite state action is present even if the conspirators who are deemed state actors are immune from suit.[207] But the pleading standard "is even stricter where the state officials allegedly involved in the conspiracy are immune from suit" as we have found in this case.[208]

Jean does not allege her brother Jim, his family, and extended family, Attorney Elliott and his firm, Judge Yeager's daughter and her husband, and Judge Horan's husband are, or acted as, state officials or actors under section 1983. So to be found to be acting under color of state law under section 1983, the private actor must "willfully participate in a joint conspiracy with state officials to deprive a person of a constitutional right[.]"[209] And Jean must plead "an agreement or

understanding between the defendants to carry out the alleged chain of events; [her] mere assertion that such a plot exists is simply not sufficient. Establishing the existence of an agreement is part of the prima facie case for civil conspiracy under 42 U.S.C. § 1983[.]"[210]

Jean has twice failed to plead facts allowing us to plausibly infer an agreement and concerted action between these private individuals and state officials. There is no set of facts from which we can infer an understanding between the state actors and private actors to deprive Jean of her constitutional rights. Jeans baldly refers to "co-conspirators" and a "conspiracy" among the "co-conspirators" who acted "in cahoots" and "reached an understanding" to take the Coulter family home and heirlooms. But she pleads vague inferences and allegations. "Bare assertions of joint action or a conspiracy are not sufficient to survive dismissal at the pleading stage."[211]

### i.   We dismiss Jean's claim against Jim with prejudice.

Jean claims her brother Jim, who is a lawyer, stole from their mother's estate by giving proceeds to his wife's extended family and took Jean's share of their mother's life insurance proceeds. Jean also alleges Judge Yeager and Jim conspired to delay the division of the family home "until such a time as [Judge] Yeager's daughter [Stephanie] . . . could move into the home[.]"[212] Jean also contends Judge Yeager has known about Jim's thefts and his misappropriation of her mother's estate but chose to "conceal this information from the state's Disciplinary Board in violation of the Code of Conduct."[213] So Judge Yeager must be "in cahoots" with Jim since he has accepted Jim's state court filings.[214] Jean claims Jim furthered the conspiracy by using the police and fire departments under the guise of a wellness check to "break-in" to the Coulter family home so Judge Yeager and his family could access the property.[215]

"[A]ppointment by a court to serve as an estate administrator does not transform a private party into a state actor."[216] So Jim is not a state actor because he acted as the administrator of his

mother's estate without objection. And "[i]n the context of an alleged conspiracy with a judge, 'merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge.'"[217] We can look to Judge Kugler in *Livingstone v. Haddon Point Manager LLC*, where he found a party failed to plead a section 1983 conspiracy claim where the pleaded facts showed nothing more than the private parties and judges "mere invocation of state legal procedures" which is "insufficient as a matter of law to establish the existence of a conspiracy."[218] Judge Kugler instead recognized allegations a private party bribed a state court judge to cause him to issue an injunction in his favor or the private party and state court judge entered into an agreement to rule in favor of the private party are more likely to state a plausible claim for relief.[219] And "[m]ere errors or irregularities in the state court proceedings are not sufficient to show a purposeful conspiracy to deny plaintiff due process."[220]

Jean alleges nothing beyond conclusory allegations to show or explain how Jim entered into an agreement or acted in concert with state officials—either Judge Yeager, Judge Horan, the police officers, or fire department employees—to deprive Jean of her due process rights. She instead laments her unhappiness with Jim's administration of their mother's estate and Judge Yeager's various rulings which allegedly favor Jim's legal positions. And Jim contacting state officials to perform a wellness check on the Coulter family home is not, by itself, a conspiracy to deprive Jean of her due process rights. Jean admits "Jim is still, officially a co-owner" of the Coulter family home.[221] He presumably could check on his asset when neighbors raise concerns. While Jean uses the word "conspired" or "conspiracy," she does not plead a fact necessary to demonstrate an unlawful agreement, understanding, or knowledge of conspiratorial actions.[222] Simply placing the word "conspiracy" into an unwieldly amended Complaint will not turn "an

otherwise ordinary but unfavorable court ruling into an unlawful agreement to deprive [Jean] of [her] rights."[223]

We again remind Jean "[a] conspiracy claim cannot be based merely on suspicion or speculation."[224] We dismiss the section 1983 conspiracy claim against Jim with prejudice as Jean has already had an opportunity to amend to cure these defects.

### ii.  We dismiss Jean's claims against Jim's family and extended family.

Jean alleges members of Jim's extended family including his wife Susan, their two children, Susan's mother Sara Jane Sanzotti Vero, and the Morrow, Hammonds, and Anderson families took "valuables" from her mother's estate with Jim's permission.[225] Jean alleges no facts showing these individuals are state actors or conspired with state actors to deprive Jean of her due process rights.

Our Court of Appeals confirmed section 1983 claims have a two-year statute of limitations.[226] And "actions of private citizens, without any showing of state action, do not give rise to a cognizable § 1983 claim."[227] Jean alleges no facts to demonstrate members of Jim's extended family plotted, planed, or conspired to carry out the alleged chain of events with any state actor.[228] And the facts Jean does allege against the extended family—including taking Coulter family heirlooms in 2013—occurred ten years ago.

We dismiss the section 1983 conspiracy claim against Susan Coulter, James Coulter, Joseph Coulter, Sara Jane Sanzotti Vero, the Marrow family, the Hammonds family, and the Anderson families with prejudice as Jean has already had an opportunity to amend.

### iii.  We dismiss Jean's claims against sister Barbara and her husband.

Jean sues her sister Barbara and Barbara's husband Jonathan Valvano—two private citizens—for presumably conspiring to deprive Jean of her due process rights. Jean contends at

some point Barbara may have given her interest in the Coulter family home to Jim, but then alleges an unidentified unpleaded person forged the deed transferring the interest. And Jean also claims Barbara and Jonathan attempted to cover-up Jim's theft of their mother's life insurance policy by permitting the "obviously forged" life insurance document to be sent to Jean through Mr. Valvano's email address.[229]

Jean fails to demonstrate state action by her sister Barbara or Barbara's husband Jonathan. And Jean alleges no facts to demonstrate Barbara or Jonathan plotted, planed, or conspired to deprive Jean of her constitutional rights with any state actor.[230] Jean has not alleged facts of a conspiracy beyond her own speculations and suspicions. We dismiss the section 1983 conspiracy claim against Barbara and Jonathan with prejudice.

### iv. We dismiss Jean's claims against Stephanie Yeager and Judge Shaffer.

Jean sues Judge Yeager's daughter Stephanie and her husband Judge Shaffer for conspiring to deprive her of due process rights by breaking into the Coulter family home with the assistance of the Butler City police and fire departments.[231] Jean claims her brother Jim provided Stephanie, Judge Shaffer, and their contractors "unfettered and secret access" to the Coulter family home.[232]

Jean is not suing Judge Shaffer in his official capacity as a judge given she is not challenging actions he took as a state court judge. She instead appears to be suing him as someone who she thinks may have had an interest in buying the Coulter family home. But to the extent she is suing him for judicial decisions, we remind Jean he has absolute immunity from suit and will not be liable for his judicial acts."[233]

Stephanie and Judge Shaffer's alleged interest in buying the Coulter family home and their relationship to Judge Yeager is not enough to establish state action. And we again remind Jean "[a] conspiracy claim cannot be based merely on suspicion or speculation."[234] Jean fails to state any

sort of claim against Stephanie or Judge Shaffer. They are not state actors. And claims against Stephanie and Judge Shaffer for touring the Coulter family home during the "assisted break-in" fail to state a conspiracy claim under section 1983 because Jean fails to allege she has been deprived of a constitutional right when Jim, a co-owner of the home, allowed the couple to tour the home.

We dismiss the section 1983 conspiracy claim against Stephanie and Judge Schaffer with prejudice.

### v. We dismiss Jean's claims against Joseph Caparosa.

Jean sues Judge Horan's husband Joseph Caparosa because he also placed a note on the door of the Coulter family home—identical to the note Judge Horan placed on the door—to signal to Judge Yeager and his family the "coast is clear" so they could enter the home on the day of the assisted break-in.[235]

Private citizen Mr. Caparosa placing a note on his neighbor's door is not state action. And Jean's conclusory allegations of conspiracy against Mr. Caparosa "with no supporting factual averments are insufficient; the pleadings must specifically present facts tending to show agreement and concerted action."[236]

We dismiss the section 1983 conspiracy claim against Mr. Caparosa with prejudice.

### vi. We dismiss Jean's claims against Attorney Elliott and his firm.

Jean sues her brother Jim's lawyer, Attorney Elliott and his firm Dillon McCandless King Coulter & Graham LLP, because they moved to transfer her civil case against Jim from the Philadelphia County Court of Common Pleas to the Butler County Court of Common Pleas.[237] Jean contends "it is clear" Jim and Attorney Elliott transferred the case to Butler County so Judge Yeager would be assigned to the case.[238]

"Attorneys performing their traditional functions will not be considered state actors solely on the basis of their position as officers of the court."[239] Jean cannot satisfy the state action requirement necessary to bring her section 1983 conspiracy claims against Attorney Elliott or his law firm solely because he is a lawyer.[240] Jean pleads no facts beyond her conclusory allegations and speculations to show Attorney Elliott or his firm entered into an agreement and acted with state officials to deprive Jean of her due process rights. And the state court judge, not Attorney Elliott, transferred the case.

We dismiss the section 1983 conspiracy claim against Attorney Elliott and his firm with prejudice.

### C.  Jean fails to state a conspiracy claim under 42 U.S.C. § 1985(3).

Jean does not plead a claim for civil conspiracy under 42 U.S.C. § 1985(3). But her allegations construed liberally could be understood as attempting a claim under section 1985.

A claim for civil conspiracy under 42 U.S.C. § 1985(3), unlike a claim under section 1983, does not have a state action requirement.[241] To state a claim Jean must plead in good faith: "(1) [defendants engaged in] a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . ; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."[242] The first element requires allegations of a conspiracy "based in fact" and not "merely upon [Jean's] own suspicion and speculation."[243] And section 1985(3) requires Jean to allege "invidious racial or otherwise class-based discriminatory animus lay behind the Defendants' actions, and she must set forth facts from which a conspiratorial agreement between the defendants can be inferred."[244]

As we repeatedly found above, Jean has not and cannot allege facts of a conspiracy beyond her own speculations and suspicions. And Jean has not alleged facts to demonstrate racial or otherwise class-based discriminatory animus laid behind the acts of her family members or the judges, court reports, neighbors, police officers, fire department employees, or lawyers she sues.

We dismiss any potential claim under section 1985(3) with prejudice.

### D.  We decline supplemental jurisdiction over Jean's state law claims.

Jean invokes our federal question jurisdiction for her civil rights conspiracy claim. She also invokes our diversity jurisdiction under 28 U.S.C. § 1332(a) for a variety of state law claims including for fraud, theft, theft by deception, conversion, replevin, invasion of privacy, trespass, and unfair and deceptive business practices.[245]

We lack diversity jurisdiction. The diversity statute has two requirements: first, all parties must be completely diverse, and second, the amount in controversy must exceed the sum or value of $75,000.[246] To establish diversity jurisdiction under 28 U.S.C. § 1332(a), Jean must allege each individual parties' citizenship, not residence.[247] "A natural person is deemed to be a citizen of the state where he is domiciled."[248] "Domicile" has two elements: "(1) the intent of the person in question to make a particular location their permanent home, and (2) physical presence."[249]

Jean alleges she is a citizen of New Jersey.[250] But she provides a mailing address in Butler, Pennsylvania.[251] Jean does not allege the citizenship of any other party but instead lists an address for each party with addresses in Pennsylvania, Ohio, and Texas.[252]

We have no basis to give Jean leave to amend to assert our diversity jurisdiction. We assumed jurisdiction based on a federal question arising under the civil rights laws. Giving Jean a chance to amend to plead the would be futile because our Court of Appeals just two months ago affirmed Judge Wiegand's dismissal of a different case Jean brought against her brother Jim and others under 28 U.S.C. § 1332(a) for lack of subject matter jurisdiction.[253] Judge Wiegand

36

considered Jean's inconsistencies as to whether her domicile is Illinois or New Jersey; her admissions to having been away from New Jersey since at least early 2020 and having no place to return in New Jersey; her consistent use of her Butler, Pennsylvania address and/or her Philadelphia P.O. box in both earlier and current lawsuits in this District; and her limited ties to New Jersey (taxes, doctors, one phone number, and a driver's license with a Pennsylvania P.O. box address).[254] Judge Wiegand concluded even if Jean's domicile is no longer Pennsylvania, Jean "has not met her burden of persuasion as the proponent of federal subject-matter jurisdiction or provided sufficient facts to establish citizenship in **any** state."[255] We agree. Jean has not met her burden of persuasion of federal subject-matter jurisdiction based on diversity given she claims she is a New Jersey citizen, but provides a Pennsylvania mailing address, and she fails to allege the citizenship of any of the thirty parties she sues.

We could exercise supplemental jurisdiction over Jean's state law claims under 28 U.S.C. § 1367(a). But our supplemental jurisdiction is discretionary.[256] We may consider our supplemental jurisdiction *sua sponte*.[257] We "may decline to exercise supplemental jurisdiction" over a claim if one of four factors exists:

    (1) the claim raises a novel or complex issue of State law,

    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

    (3) the district court has dismissed all claims over which it has original jurisdiction, or

    (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.[258]

We decline to exercise supplemental jurisdiction over Jean's state law claims because we dismissed all claims over which we enjoyed original jurisdiction based on the federal question posed under the civil rights law.[259]

### III.   Conclusion

We dismiss Jean's second attempt to turn her family and neighborhood battle concerning her mother's estate and family home into a civil rights lawsuit. She offers no facts after two attempts to allow us to entertain her distortion of civil rights laws.

We lack jurisdiction under the *Rooker-Feldman* doctrine to hear Jean's claims based on the Orphans' Court long-ago completed administration of her mother's estate. Jean's allegations of conspiracy among or between Jean's siblings and their families, Judge Yeager and his family, Judge Horan and her husband, Attorney Elliott and his law firm, the court reporters, Officer Howard, Chief of Police O'Neill, the unknown officer of the police of the City of Butler, and the unknown employees of the City of Butler fire department must be considered separately because they are not barred by *Rooker-Feldman* or *Younger*. But Jean's claims against the judges, court reporters, police officers, and fire department employees are barred by judicial, quasi-judicial immunity, or for failure to state a claim. And Jean failed to state a claim against the private individuals because they are not state actors.

We decline to exercise supplemental jurisdiction over Jean's state law claims. The case is over in the federal district court.

---

[1] We also consider, in addition to Jean Coulter's factual allegations, the court filings in the ongoing state court matters. "It is well-settled that a court may look beyond the complaint in ruling on a motion to dismiss and consider 'matters of public record, including court files and records, documents referenced in the complaint, and documents essential to a plaintiff's claims and attached to either the plaintiff's complaint or the moving defendants' Rule 12(b)(6) motion to dismiss." *Riffin v. Consol. Rail Corp.*, 363 F. Supp. 3d 569, 574 n.2 (E.D. Pa. 2019) (quoting *Gorton v. Air Liquid Sys. Corp.*, 303 F. Supp. 3d 278, 303 (M.D. Pa. 2018)), *aff'd*, No. 19-1414, 2019 WL 3072201 (3d Cir. July 15, 2019). We construed all the facts in Jean's favor.

[2] ECF Doc. No. 43-2 at 1. Jean Coulter sues and otherwise identifies several persons with her Coulter surname. It is not our style to identify persons by their first names. But this case is an exception as it relates to the three Coulter siblings.

[3] *Id.* at 9.

[4] ECF Doc. No. 40 at 5; ECF Doc. No. 43-1.

[5] ECF Doc. No. 43-2.

[6] *Id.*

[7] ECF Doc. No. 43-1.

[8] ECF Doc. No. 40 at 26–27. It is unclear whether Jean—or anyone—lived in the Coulter family home following Ellen Coulter's passing.

[9] *Id.*

[10] *Id.* at 13.

[11] *Id.*

[12] *Id.* at 31–32.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 33.

[16] *Id.* at 5.

[17] *Id.* at 5, 27–30. We refer to the "Morrow family" to include Karen (Vero) Morrow, her husband Roger Morrow, and their children Sara Morrow and Benjamin Morrow. The "Hammonds family" includes Pamela (Vero) Hammonds, her husband Steven M. Hammonds, and their son Patrick V. Hammonds. The "Anderson family" includes Mary Joanne (Vero) Anderson, her husband Brian L. Anderson, and their children Abigail Anderson and Nicholas Anderson.

[18] *Id.* at 5–6, 28.

[19] *Id.* at 26.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* at 26–27.

[24] *Id.* at 9.

[25] *Id.*

[26] *Id*. at 14. Judge Horan currently serves as a judge on this Court requiring the Court of Appeals to designate me to address the parties' claims. *See* ECF Doc. No. 52 at 2.

[27] ECF Doc. No. 40 at 14.

[28] *Id*.

[29] *Id*. at 9.

[30] *Id*. at 13.

[31] *Id*. at 22–23.

[32] *Id*.

[33] *Id*. at 11–12. It is difficult to follow the facts Jean alleges – including the timeline of the underlying state court cases – given Jean's factual recitation of the various state court cases are intertwined and often lack dates. We liberally construe her amended Complaint and have looked at the state court records and dockets to best interpret the facts Jean alleges in her amended Complaint.

[34] *Id*.

[35] *Id*. at 12.

[36] *Coulter v. Coulter*, No. 2686-2015, 2016 WL 5798780, at *1 (Pa. Super. Ct. Oct. 3, 2016).

[37] *Id.*

[38] *Id.*

[39] ECF Doc. No. 40 at 12. Jean seemingly ignores the undisputed fact Judge Shirdan-Harris transferred the case, not Jim or his counsel.

[40] *Id*.

[41] *Id*. at 13.

[42] *Id*.

[43] *Id*. at 13–14.

[44] *Id*. at 8, 12–14.

[45] *Id*. at 10, 16–20.

[46] *Id*. at 10.

[47] *Id*. at 17.

[48] *Id*. at 16–17.

[49] *Id*.

[50] *Id*. at 15–16.

[51] *Id*. at 17.

[52] *Id*. at 17–19.

[53] *Id*. at 17–18.

[54] *Id*. at 17.

[55] *Id*. at 18.

[56] *Id*.

[57] *Id*. at 8, 10.

[58] *Id*. at 20.

[59] ECF Doc. No. 40 at 23; ECF Doc. Nos. 43-3, 43-4.

[60] ECF Doc. Nos. 43-3, 43-4.

[61] ECF Doc. No. 40 at 28.

[62] *Id*. at 8.

[63] ECF Doc. No. 43-3.

[64] ECF Doc. No. 40 at 9.

[65] *Id*. at 9, 21.

[66] *Id*. at 22.

[67] *Id*.

[68] *Id*. at 23.

[69] *Id*.

[70] *Id*.

[71] *Id*. at 9.

[72] *Id*. at 10.

[73] *Id*. at 28.

[74] ECF Doc. No. 43-3 at 3.

[75] *Id*. at 1–3.

[76] Jean is no stranger to using or (some judges have found) abusing the court systems. The Pennsylvania Superior Court in 2017 recognized Jean litigated at least ninety-one frivolous cases in either state court or federal court. *Coulter v. Lindsay*, 159 A.3d 947, 955 (Pa. Super. 2017). This number has only increased in the past six years.

We cannot ignore judges have "warned [Jean] on multiple occasions that her use of vitriolic language, filing of meritless, duplicative motions, and initiation of frivolous, duplicative lawsuits, would not be tolerated[.]" *Coulter v. Ramsden*, No. 12-1050, 2012 WL 6592597, at *3 (W.D. Pa. Dec. 18, 2012), *aff'd* (Aug. 1, 2013). But "Jean has chosen instead to persist in harassing and vexatious filings, and provides no indication whatsoever that she intends to cease." *Id*. Judge Bissoon over a decade ago designated Ms. Coulter "a vexatious litigant" following a series of civil rights cases brought by Jean challenging state court proceedings terminating her parental rights. *Id*. So Judge Bissoon prohibited Jean "from filing any additional civil actions related to or arising from the state court proceedings involving her criminal conviction for assaulting her minor child, and/or the subsequent termination of her parental rights." *Id*.

And the Pennsylvania Superior Court also reemphasized just six years ago "[Jean's] conduct is the definition of vexatious" and highlighted Jean's "repeated abuse of our judicial system." *Coulter*, 159 A.3d at 954. We caution Jean, as explained more below, she cannot re-litigate state law estate claims not decided in her favor. And Jean cannot state a viable conspiracy claim under section 1983 by simply using the terms "conspiracy" and "co-conspirator" and then alleging a series of disconnected, isolated events and speculative "facts" occurring years apart while expecting us to fill in the gaps. Her allegations do not state a claim. We dismiss all her claims with prejudice.

[77] ECF Doc. No. 40. Jean sued her family members, judges, neighbors, lawyers, a law firm, court reporters, police officers, and employees of the fire department on December 16, 2022. *See* ECF Doc. No. 1. Chief Judge Chagares assigned the case to us on January 4, 2023. *See* ECF Doc. No. 3. Jean's siblings and their families, Judge Yeager and his family, Judge Horan and her husband, Attorney Elliott and his law firm, the court reporters, the police officers, and the fire department employees all moved to dismiss. *See* ECF Doc. Nos. 26, 28, 30, 31, 32, 36. Jean amended her Complaint on March 16, 2023. *See* ECF Doc. No. 40. We are now addressing the multiple motions to dismiss the amended Complaint.

[78] ECF Doc. No. 40 at 11–16.

[79] *Id*. at 16–20.

[80] *Id*. at 20–25.

[81] *Id*. at 25–31.

[82] *Id*. at 31–33.

---

[83] *Id*. at 4.

[84] *Id*. at 33.

[85] ECF Doc. Nos. 43, 45, 48, 51, 53. Jean must state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If Jean is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id*. (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc*., 643 F.3d 77, 84 (3d Cir. 2011)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility … a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs*., 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id*. (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a Rule 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert W. Mauthe, M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) we "identify allegations that … 'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' … in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations … and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]'…, we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted); *Connelly v. Lane Constr. Corp*., 809 F.3d 780, 787 (3d Cir. 2016).

Under Rule 12(b)(1), a defendant may move to dismiss a complaint based on a court's "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction differs from a Rule 12(b)(6) motion to dismiss for failure to state a claim because a 12(b)(1) motion assesses the court's jurisdiction, whereas a 12(b)(6) motion assesses a claim's merits." *Spadoni v. Easton Area Sch. Dist*., No. 07-5348, 2008 WL 2169525, at *4 (E.D. Pa. May 23, 2008). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.,* 462 F.3d 294, 302 n.3 (3d Cir. 2006).

Complaints filed by *pro se* litigants, such as Jean Coulter, are liberally construed, but must still "allege sufficient facts . . .  to support a claim." *Rivera v. Monko*, 37 F.4th 909, 914 (3d Cir. 2022) (quoting *Mala v. Crown Bay Marina, Inc*., 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted)).

[86] ECF Doc. Nos. 43, 44.

[87] ECF Doc. Nos. 51, 52.

[88] ECF Doc. Nos. 45, 46.

[89] ECF Doc. Nos. 48, 49.

[90] ECF Doc. Nos. 53, 54.

[91] ECF Doc. No. 58 at 1.

[92] *Id*. at 4–36.

[93] *Korinko v. Come Ready Nutrition, LLC*, No. 20-226, 2020 WL 4926177, at *8 (W.D. Pa. Aug. 21, 2020) (citing *ALA, Inc. v. CCAIR, Inc*., 29 F.3d 855, 859 (3d Cir. 1994)); *see also* Fed. R. Civ. P. 11.

[94] *Korinko*, 2020 WL 4926177, at *8.

[95] ECF Doc. No. 40 at 4 ("In essence, this matter concerns actions undertaken by a group of co-conspirators to violate Plaintiff Jean Coulter's ('Jean') Constitutional Right to Due Process in matters in the Civil Division and/or Orphan's Court [*sic*] in the Butler County Court of Common Pleas related to assets from the Estate of the Coulters' [*sic*] Mother.").

[96] *Id*. at 9 ("It is believed . . . [Judge] Yeager and Jim conspired to delay the division" of the Coulter family home "until such a time as [Judge] Yeager's daughter [Stephanie Yeager] could move into the home that [Judge] Yeager found/finds so 'attractive.'").

[97] *Mikhail v. Kahn*, 991 F. Supp. 2d 596, 613 (E.D. Pa. 2014), *aff'd,* 572 F. App'x 68 (3d Cir. 2014) (quoting *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 165 (3d Cir. 2010)). The *Rooker-Feldman* doctrine is named after the two Supreme Court cases which announced it, *Rooker v. Fidelity Trust Co*., 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The doctrine instructs "the Supreme Court of the United States, and not the lower federal courts, has jurisdiction to review a state court decision[.]" *Mikhail*, 991 F. Supp. 2d at 613 (quoting *Parkview Associates P'ship v. City of Lebanon*, 225 F.3d 321, 324 (3d Cir. 2000)).

[98] *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (internal citations omitted).

[99] *Mikhail*, 991 F. Supp. 2d at 613) (citing *Skinner*, 562 U.S. at 532).

[100] *Stephens v. Kenney*, 802 F. App'x 715, 718 (3d Cir. 2020) (quoting *Great W. Mining*, 615 F.3d at 169).

[101] *Great W. Mining,* 615 F.3d at 166 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 285 (2005)).

[102] *Id.*

[103] *Id.* at 167 (citing *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 7, 887 (2d Cir. 2005)).

[104] *Id.*

[105] *Mikhail*, 991 F. Supp. 2d at 613 (quoting G*reat W. Mining*, 615 F.3d at 167–68).

[106] *Mason v. Stroyan*, No. 10-1953, 2010 WL 6560738, at *11 (M.D. Pa. Oct. 29, 2010), *report and recommendation adopted*, No. 10-1953, 2011 WL 1578376 (M.D. Pa. Apr. 25, 2011).

[107] *Id.*

[108] *Id*.

[109] *Id.*

[110] *Great W. Mining*, 615 F.3d at 173 (internal citations omitted); *see also Stephens*, 802 F. App'x at 719 ("To the extent that Stephens may also be asserting that some independent injury was caused by the defendants' conduct during the incompetency, probate, and subsequent Orphans' Court proceedings, those claims arguably are not barred by the *Rooker-Feldman* doctrine.").

[111] *Younger v. Harris*, 401 U.S. 37, 44 (1971).

[112] *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013).

[113] *Lang v. Houser*, No. 11-4638, 2012 WL 1080258, at *4 (E.D. Pa. Mar. 28, 2012) (citing *Marks v. Stinson*, 19 F.3d 873, 882 (3d Cir. 1994)).

[114] *Smith & Wesson Brands, Inc. v. Att'y Gen. of New Jersey*, 27 F.4th 886, 891 (3d Cir. 2022) (quoting *Sprint Commc'ns, Inc.*, 571 U.S. at 78).

[115] *Malhan v. Sec'y United States Dep't of State*, 938 F.3d 453, 462 (3d Cir. 2019) (applying factors announced in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982)).

[116] *Lazaridis v. Wehmer*, 591 F.3d 666, 670 n. 4 (3d Cir. 2010) (quoting *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989)).

[117] *Mikhail*, 991 F. Supp. 2d at 608.

[118] *Id.* at 612.

[119] *Id*. at 633 (internal quotations and citations omitted). But Judge Pratter found the husband's requests for injunctive and declaratory relief barred by *Younger*. *Id*. at 632.

[120] *Id*. at 629.

[121] *Id*. at 633 (internal citations omitted); *see also Lyman v. Philadelphia Ct. of Common Pleas*, No. 16-5191, 2017 WL 2813228, at *6 (E.D. Pa. June 29, 2017), *aff'd sub nom. Lyman v. Philadelphia Ct. of Common Pleas Domestic Rels. Div*., 751 F. App'x 174 (3d Cir. 2018) ("With respect to [the] claim for damages, however, *Younger* abstention does not apply."); *Stensrud v. Rochester Genesee Reg'l Transportation Auth*., 507 F. Supp. 3d 444, 457 (W.D.N.Y. 2020) ("This case does not fall within the scope of *Younger*. Plaintiffs seek only monetary damages, not any form of injunctive or declaratory relief.").

[122] *Lang*, 2012 WL 1080258, at *4 ("[Lang's] action for damages parallels the state proceedings but does not interfere with them. We need not abstain from adjudicating his action for damages.").

[123] *Barbiero v. Kaufman*, No. 12-6869, 2013 WL 3939526, at *5 (E.D. Pa. July 30, 2013), *aff'd*, 580 F. App'x 107 (3d Cir. 2014) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976); *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939); *United States v. Bank of N.Y. & Trust Co*., 296 U.S. 463, 477 (1936)).

[124] *Dailey v. Nat'l Hockey League*, 987 F.2d 172, 175 (3d Cir. 1993) (citing *Princess Lida*, 305 U.S. at 466).

[125] *Id*. at 176 (citing *Princess Lida*, 305 U.S. at 466).

[126] *Dyno v. Dyno*, No. 20-3302, 2021 WL 3508252, at *3 (3d Cir. Aug. 10, 2021).

[127] *Id*.

[128] *Eckerd Corp. v. Rhoads Ave. Newtown Square, LP*, Nos. 13-4752, 14-5293, 2018 WL 3656314, at *8 (E.D. Pa. Aug. 1, 2018) (citing *Colorado River*, 424 U.S. 800).

[129] *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996); *see also Colorado River*, 424 U.S. at 813 ("The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.") (citations omitted).

[130] *Eckerd Corp.*, 2018 WL 3656314, at *9 (citing *Yang v. Tsui*, 416 F.3d 199, 204 n.5 (3d Cir. 2005)).

[131] *Id.* (citing *Ryan v. Johnson*, 115 F.3d 193, 196 (3d Cir. 1997)).

[132] *Id*. (citing *Albright v. Sears, Roebuck and Co*., No. 95-4240, 1995 WL 664742, at *1 (E.D. Pa. Nov. 7, 1995)).

[133] *Id.* (citing *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 308 (3d Cir. 2009)). In determining whether an action presents "extraordinary circumstances" we consider six factors: "(1) [in an *in rem case*,] which court first assumed jurisdiction over [the] property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6)

whether the state court will adequately protect the interests of the parties." *Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 308.

[134] ECF Doc. No. 40.

[135] *Id*.

[136] ECF Doc. No. 44 at 9–14.

[137] ECF Doc. Nos. 46, 52, 54.

[138] U.S. Const. amend. XIV.

[139] *United States v. Salerno*, 481 U.S. 739, 746 (1987).

[140] *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 425 (3d Cir. 2006) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

[141] *Sherrill v. City of Hoboken*, No. 20-1251, 2021 WL 4473392, at *1 (3d Cir. Sept. 30, 2021) (citing *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011)).

[142] *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2019).

[143] *Mikhail*, 991 F. Supp. 2d at 642 (quoting *United States v. Price*, 383 U.S. 787, 799 (1966)).

[144] *Id.* (*citing Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141–42 (3d Cir.1995); *see also Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) ("[A] plaintiff seeking to hold an individual liable under § 1983 must establish that she was deprived of a federal constitutional or statutory right by a state actor.").

[145] *Trainor v. Overmyer*, No. 20-00260, 2021 WL 5770215, at *3 (W.D. Pa. Dec. 6, 2021) (internal citations omitted).

[146] *Kitko v. Young*, No. 10-189, 2012 WL 399981, at *3 (W.D. Pa. Feb. 7, 2012), *aff'd*, 575 F. App'x 21 (3d Cir. 2014) (quoting *Capogrosso v. The Supreme Court of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009)).

[147] *Langella v. Cercone*, No. 09-312, 2010 WL 2402971, at *4 (W.D. Pa. June 10, 2010) (quoting *Capogrosso*, 588 F.3d at 185).

[148] *Jutrowski*, 904 F.3d 293–94, n. 15 (citing *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001) (quoting 42 U.S.C. § 1983)).

[149] *Blessing v. City of Latrobe*, No. 20-1212, 2022 WL 114077, at *9 (W.D. Pa. Jan. 12, 2022) (citing *Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991)).

[150] ECF Doc. No. 52 at 5–8.

[151] ECF Doc. No. 58 at 2.

[152] *Capogrosso*, 588 F.3d at 184 (quoting *Azubuko v. Royal*, 443 F.3d 302, 303 (3d Cir. 2006)).

[153] *Stokes v. City of Philadelphia*, No. 22-0338, 2022 WL 16578285, at *6 (E.D. Pa. Oct. 31, 2022) (citing *Weimer v. Cnty. of Fayette*, 972 F.3d 177, 190 (3d Cir. 2020)).

[154] *Figueroa v. Blackburn*, 208 F.3d 435, 440 (3d Cir. 2000) (citing *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991)); *see also Clark v. All the Judges of the Crim. Just. Ctr.*, No. 21-5690, 2022 WL 1567321, at *2 (E.D. Pa. May 18, 2022).

[155] *Clark*, 2022 WL 1567321, at *2 (quoting *Gallas v. Supreme Ct. of Pa.*, 211 F.3d 760, 768 (3d Cir. 2000)).

[156] *Clark v. Warden & All Prison Guards*, No. 21-5498, 2022 WL 1443427, at *4 (E.D. Pa. May 5, 2022) (quoting *Figueroa*, 208 F.3d at 443–44).

[157] *Kinnard v. George*, 652 F. App'x 96, 98 (3d Cir. 2016) (internal quotations and citations omitted).

[158] *Id.* (holding lower court properly dismissed section 1983 action by a *pro se* plaintiff against two state court judges where plaintiff complained of "judicial actions [the] Judges . . . took in the course of an official criminal proceeding" because the judges were "protected by absolute judicial immunity").

[159] *Knezevich v. Ptomey*, 761 F. App'x 904, 907 (11th Cir. 2019).

[160] ECF Doc. No. 58 at 2.

[161] ECF Doc. No. 40 at 9.

[162] *Id.* at 22.

[163] *Id.* at 23.

[164] *Id.* at 16–17.

[165] ECF Doc. No. 43-3.

[166] To the extent that Jean's section 1983 damages claims against Judge Yeager can be construed as a claim against the court itself (as claims brought against Judge Yeager in his official capacity) this claim is dismissed with prejudice as barred by Eleventh Amendment sovereign immunity. *Mikhail*, 991 F. Supp. 2d at 665–66 (citing *Hafer v. Melo*, 502 U.S. 21, 26 (1991)).

[167] ECF Doc. No. 40 at 14.

[168] *Id.*

[169] *Id.* at 15.

[170] *Id.* at 12–14.

[171] ECF Doc. No. 49 at 7–8; ECF Doc. No. 52 at 5–7.

[172] ECF Doc. No. 49 at 9–10.

[173] ECF Doc. No. 58 at 2.

[174] *Capogrosso*, 588 F.3d at 184 (quoting *Azubuko*, 443 F.3d at 303).

[175] To the extent that Jean's section 1983 damages claims against Judge Horan can be construed as a claim against the court itself (as claims brought against Judge Horan in her official capacity) this claim is dismissed with prejudice as barred by Eleventh Amendment sovereign immunity. *Mikhail*, 991 F. Supp. 2d at 665–66 (citing *Hafer*, 502 U.S. at 26).

[176] *Johnson v. Moran*, No. 12-313, 2013 WL 5671266, at *6 (W.D. Pa. Oct. 15, 2013) (quoting *Hunt v. Bennett*, 17 F.3d 1263, 1268 (10th Cir. 1994)).

[177] ECF Doc. No. 40 at 9.

[178] *Id*. at 3.

[179] ECF Doc. No. 54 at 4–6.

[180] *Shahin v. Darling*, 606 F. Supp. 2d 525, 543 (D. Del. 2009), *aff'd*, 350 F. App'x 605 (3d Cir. 2009) (internal citations omitted).

[181] *Id.* (quoting *Carpenter v. Vaughn*, 296 F.3d 138, 155 (3d Cir. 2002)).

[182] *Id.* (citing *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993); *Martin v. Kline*, 105 F. App'x 367 (3d Cir. 2004)).

[183] ECF Doc. No. 40 at 17.

[184] *Id*. 16–17.

[185] *Id*.

[186] *Id*. at 17.

[187] *Id*.

[188] ECF Doc. No. 46 at 5–13.

[189] ECF Doc. No. 58 at 1.

[190] *Peters v. Brown*, No. 16-260, 2018 WL 2937494, at *8 (W.D. Pa. June 12, 2018), *aff'd*, 793 F. App'x 118 (3d Cir. 2019).

[191] *Cole v. Encapera*, 758 F. App'x 252, 254 (3d Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[192] *Stokes*, 2022 WL 16578285, at *7 (quoting *Womack v. Smith*, 2009 WL 5214966, at *4 (M.D. Pa. 2009)).

[193] *Cole*, 758 F. App'x at 254 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

[194] *Jutrowski*, 904 F.3d at 293–94 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52 (1970)).

[195] *Stokes*, 2022 WL 16578285, at *7 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

[196] *Id.* at *6 (citing *Pearson*, 555 U.S. at 242).

[197] *Cole*, 758 F. App'x at 255 (citing *Grant v. City of Pittsburgh*, 98 F.3d 116, 118 (3d Cir. 1996)).

[198] *Muth v. Woodring*, 755 F. App'x 109, 113 (3d Cir. 2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017)).

[199] *Wiggs v. Foley*, No. 20-02267, 2021 WL 462782, at *4 (E.D. Pa. Feb. 9, 2021) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[200] *Bower v. Vill. of Marblehead, Ohio*, No. 18-2502, 2020 WL 3487847, at *9 (N.D. Ohio June 26, 2020) ("Wellness checks are also not constitutional violations, especially where Plaintiff is unable to show that any part of the wellness check infringed on her constitutional rights.").

[201] *See Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 309–10 (3d Cir. 2020) ("Eleventh Amendment immunity bars actions for retroactive relief against state officers acting in their official capacity.").

[202] *Coulter v. Allegheny Cnty. Bar Ass'n*, 496 F. App'x 167, 168–69 (3d Cir. 2012).

[203] *Williams v. Sorg*, No. 22-4036, 2023 WL 2939589, at *2 (E.D. Pa. Apr. 13, 2023) (citing *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019)).

[204] *Kitko*, 2012 WL 399981, at *3 (quoting *Capogrosso*, 588 F.3d at 184).

[205] *Hammond v. Creative Fin. Plan. Org., Inc.*, 800 F. Supp. 1244, 1250 (E.D. Pa. 1992).

[206] *Johnson*, 2013 WL 5671266, at *6 (quoting *Hunt*, 17 F.3d at 1268).

[207] *Hammond*, 800 F. Supp. at 1249 (citing *Dennis v. Sparks*, 449 U.S. 24, 28 (1980)).

[208] *Johnson*, 2013 WL 5671266, at *6 (quoting *Hunt*, 17 F.3d at 1268).

[209] *Vakkas v. Tyson Assocs.*, No. 98-4981, 2000 WL 325916, at *9 (E.D. Pa. Mar. 28, 2000) (internal citation omitted).

[210] *Kist v. Fatula*, No. 3:2006-67, 2007 WL 2404721, at *8 (W.D. Pa. Aug. 17, 2007).

[211] *Coulter*, 496 F. App'x at 169 (citing *Twombly*, 550 U.S. at 556).

[212] ECF Doc. No. 40 at 9.

[213] *Id.* at 10.

[214] *Id.* at 28.

[215] *Id.* at 20.

[216] *Dominic v. Goldman*, 560 F. Supp. 3d 579, 589 (D.N.H. 2021) ("Courts have routinely found that appointment by a court to serve as an estate administrator does not transform a private party into a state actor."); *see also Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Keeney v. Donatelli*, No. 06-5403, 2007 WL 475818, at *2 (E.D. Pa. Feb. 9, 2007).

[217] *Livingstone v. Haddon Point Manager LLC*, No. 191341, 2020 WL 7137852, at *11 (D.N.J. Dec. 7, 2020) (quoting *Dennis*, 449 U.S. at 28).

[218] *Id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, n.21 (1982)).

[219] *Id.*

[220] *Hammond*, 800 F. Supp. at 1250 (internal citations omitted).

[221] ECF Doc. No. 40 at 16–17.

[222] *Livingstone*, 2020 WL 7137852, at *11 (citing *Hammond*, 800 F. Supp. at 1250).

[223] *Id.*

[224] *Blessing*, 2022 WL 114077, at *9 (citing *Young*, 926 F.2d at 1405 n.16).

[225] ECF Doc. No. 40 at 27–30.

[226] *Walsh v. Quinn*, No. 09-167, 2009 WL 2207816, at *3 (W.D. Pa. July 23, 2009), *aff'd*, 359 F. App'x 273 (3d Cir. 2009) (citing *Garland v. U.S. Airways Inc.*, 2008 WL 564694, at *3 (3d Cir. 2008)).

[227] *Gonzalez v. Feiner*, 131 F. App'x 373, 377 (3d Cir. 2005).

[228] *See Hammond*, 800 F. Supp. at 1249 ("The plaintiff must make specific factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events.").

[229] ECF Doc. No. 40 at 31.

[230] *See Hammond*, 800 F. Supp. at 1249.

[231] ECF Doc. No. 40 at 10.

[232] *Id*. at 8, 10.

[233] *Capogrosso*, 588 F.3d at 184 (quoting *Azubuko*, 443 F.3d at 303). And to the extent Jean is bringing a section 1983 claim for monetary damages against Judge Shaffer in his official capacity, she is barred by the immunity afforded to the states by the Eleventh Amendment. *Mikhail*, 991 F. Supp. 2d at 665–66 (citing *Hafer*, 502 U.S. at 26).

[234] *Blessing*, 2022 WL 114077, at *9 (citing *Young*, 926 F.2d at 1405, n.16).

[235] ECF Doc. No. 40 at 15.

[236] *Johnson*, 2013 WL 5671266, at *6 (quoting *Hunt*, 17 F.3d at 1268).

[237] ECF Doc. No. 40 at 12.

[238] *Id*.

[239] *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 277–78 (3d Cir. 1999).

[240] *Mikhail*, 991 F. Supp. 2d at 644; *see also Peterec-Tolino v. New York*, 364 F. App'x 708, 711 (2d Cir. 2010).

[241] *Edmonds v. Semple*, No. 22-653, 2022 WL 3219478, at *5 (W.D. Pa. July 22, 2022), *report and recommendation adopted*, No. 22-653, 2022 WL 3214642 (W.D. Pa. Aug. 9, 2022) (citing *Griffin v. Breckenridge*, 403 U.S. 88 (1971)).

[242] *Sherrill*, 2021 WL 4473392, at *1 (quoting *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006)).

[243] *Id.* (quoting *Young*, 926 F.2d at 1405, n.16 (3d Cir. 1991)).

[244] *Farrar v. McNesby*, 639 F. App'x 903, 906 (3d Cir. 2016) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993)).

[245] Jean raises these state law claims in a conclusory fashion. She does not set forth any of the elements of these claims, and it is difficult to determine which parties are involved in these claims.

[246] 28 U.S.C. § 1332(a).

[247] *Walls v. Ahmed*, 832 F. Supp. 940, 942 (E.D. Pa. 1993) (*citing Sun Printing & Pub. Assn. v. Edwards*, 194 U.S. 377 (1904)).

[248] *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010).

[249] *Ahmed*, 832 F. Supp. at 942.

[250] ECF Doc. No. 40 at 1.

[251] *Id*.

[252] *Id*. at 2–3.

[253] *Coulter v. Coulter*, No. 22-2228, 2023 WL 1879239, at *2 (3d Cir. Feb. 10, 2023).

[254] *Coulter v. Coulter*, No. 21-861, 2022 WL 1467835, at *4 (W.D. Pa. May 10, 2022), *aff'd*, No. 22-2228, 2023 WL 1879239 (3d Cir. Feb. 10, 2023).

[255] *Id*. (emphasis in original).

[256] *See Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000).

[257] *See Patel v. Meridian Health Sys., Inc.*, 666 F. App'x 133, 136 (3d Cir. 2016).

[258] 28 U.S.C. § 1367(c); *see also Patel*, 666 F. App'x at 136.

[259] 28 U.S.C. § 1367(c)(3).